IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

WILLIAM BOYD BURGESS,

      Plaintiff,

v.                                    CASE NO. 2:04-cv-00931

JO ANNE BARNHART,
Commissioner of Social Security,

      Defendant.

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case is presently pending before the court on Plaintiff's Motion for Summary Judgment and Defendant's Motion for Judgment on the Pleadings. Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, William Boyd Burgess (hereinafter referred to as "Claimant"), filed an application for DIB on March 11, 2002, alleging disability as of January 29, 2002, due to legs, knee, back and head impairments. (Tr. at 88-90, 127.) The claim was denied initially and upon reconsideration. (Tr. at 65-69, 72-73.) On February 28, 2003, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 74.) The hearing was

held on December 11, 2003, before the Honorable Theodore Burock. (Tr. at 562-84.)  By decision dated April 21, 2004, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 15-32.)  The ALJ's decision became the final decision of the Commissioner on July 20, 2004, when the Appeals Council denied Claimant's request for review.  (Tr. at 6-10.)  On August 27, 2004, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2004).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment

2

meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2004). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 16, 31.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of chronic low back pain

syndrome secondary to degenerative disc disease, status-post repeated strain/sprain, chronic neck pain syndrome with referred headache secondary to degenerative disc disease, status-post cervical spine strain/sprain, right carpal tunnel syndrome, left cubital tunnel syndrome and depression. (Tr. at 16.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 16.) The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 17.) As a result, Claimant cannot return to his past relevant work. (Tr. at 17.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as produce weigher and sub-assembler, which exist in significant numbers in the national economy. (Tr. at 18.) On this basis, benefits were denied. (Tr. at 18.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

4

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was forty-nine years old at the time of the administrative hearing. (Tr. at 564.) Claimant graduated from high school. (Tr. at 567.) In the past, Claimant worked in the coal mines. (Tr. at 579.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize that evidence of record relevant to Claimant's challenges to the Commissioner's decision.

Claimant sustained a head injury in February of 1995, when he slipped and fell on ice. (Tr. at 183-85, 434.) C.Y. Amores, M.D. diagnosed cerebral concussion, lumbar strain and contused

laceration of the scalp.  (Tr. at 434.)

On April 20, 1995, Dr. Amores noted that Claimant was still working but complaining of persistent headaches and neck and back pain.  Dr. Amores' neurological examination was normal, and he found no focal deficit.  Claimant experienced amnesia surrounding his accident, and Dr. Amores recommended Claimant see a specialist in traumatic brain injury.  (Tr. at 187.)

Claimant sustained additional injuries to his back in subsequent years.  (Tr. at 277, 443.)  Claimant also reported to the emergency room in late 1998 and early 1999, complaining of numbness to the left arm and face.  (Tr. at 438-41.)  X-rays of the lumbar spine on October 23, 1998, showed mild degenerative changes in the lumbar spine.  (Tr. at 459.)  An MRI of the cervical spine on December 15, 1998, showed disc herniation at C6-7 eccentric to the left.  (Tr. at 458.)

On February 28, 1999, Claimant reported to Shawnee Hills, Inc. complaining of memory and mood problems.  Claimant was oriented times four and his memory was intact both recently and remotely. Immediate recall and other intellectual functioning tests were done at age appropriate level.  Ted Thornton, M.D. diagnosed major depression, current, moderate, features of GAD and a possible mental disorder not otherwise specified due to his head injury. Claimant's GAF was rated at 60.  (Tr. at 381.)

In treatment notes from Marsha L. Bailey, M.D. dated October

26, 1998, December 16, 1998, and January 5, 1999, Dr. Bailey notes Claimant's memory problems.  (Tr. at 388-96.)

On April 15, 1999, Kuruvilla John, M.D. examined Claimant for evaluation of his head injury.  Dr. John noted that Claimant had no recollection of what happened when he injured his head in 1995, but it was communicated to him at some point.  Dr. John noted that Claimant "fell apparently without being witnessed.  He hit the back of his head and lost consciousness.  He then woke up and got into his truck and drove off well past where he was supposed to turn. He was initially tracked down and taken to the hospital.  He does not recall being in the hospital except for brief periods here and there."  (Tr. at 398.)  Since then, Claimant reported memory problems and had difficulty giving his exact work history. Claimant reported difficulty remembering things his children told him and rechecking things several times when he engages in certain tasks.  Dr. John reported that Claimant scored a 30/30 on a mini mental status examination and that Claimant had significant depression.  Claimant had difficulty giving a detailed history and had patchy loss of memory.  Cranial nerve examination showed normal visual fields to confrontation without neglect.  Facial sensation and movements were intact. Motor examination was normal.  Dr. John opined that most of Claimant's memory loss was due to depression. (Tr. at 399.)

The record includes evidence from I. Derakhshan, M.D. dated

February 26, 1999, through June 25, 1999. Dr. Derakhshan examined Claimant related to his complaints of face numbness and headaches. (Tr. at 400-11.)   On March 28, 1999, Dr. Derakhshan noted Claimant's severe memory impairment.  When asked how he continues to work with such a severe memory impairment, Claimant answered that "most of his work is done by [rote] memory and he has done them so many times, requiring little memorizing at any rate." (Tr. at 403.)  The neurological examination was normal, and cranial nerve examination showed no abnormality in the visual fields. Routine memory testing was not very remarkable.  Dr. Derakhshan suspected normal pressure hydrocephalus and ordered a CT scan, an EEG and a nerve conduction study. (Tr. at 403.)

Claimant underwent an EMG on May 18, 1999, which showed severe carpal tunnel compression on the right and cubital tunnel compression of the ulnar at the elbow on the left.  (Tr. at 406.)

The record includes treatment notes from Dr. Thornton dated August 13, 1999, October 19, 1999, December 22, 1999, and January 24, 2000.  (Tr. at 426-33.)

On May 17, 2001, M. Jerry Day, M.D., a neurologist, examined Claimant and concluded that Claimant "has basically a syndrome I see commonly with coal miners with more than twenty years work experience.  He has multiple repetitive traumatic injuries to his lumbar spine, no distinct disc herniation or fracture, but nonetheless severe with limited lumbar mobility.  This places him

at danger performing his job because of his limited mobility."
(Tr. at 285.) Dr. Day recommended a functional capacity evaluation
to corroborate these findings and noted Claimant's expressed desire
to work until he was 55.  Dr. Day believed this was unlikely,
"given his current degree of pain and limited mobility he needs a
functional capacity evaluation to further document his limited
abilities and then in my opinion pursue retirement and/or
disability evaluation."  (Tr. at 285.)

     Sunny S. Bell, M.A. conducted a consultative mental
examination of Claimant on June 4, 2001.  Claimant's mood was
depressed and his affect restricted.  Immediate memory skills were
markedly deficient, and he was unable to correctly repeat four
items.  Recent memory skills were markedly deficient, and he
correctly recalled none of four items after 30 minutes.  Remote
memory skills appeared moderately deficient, and he had some
difficulty recalling past history.  Concentration was markedly
deficient as indicated by the subtest Digit Span.  (Tr. at 465.)
On the WAIS-III, Claimant obtained a verbal IQ score of 71, a
performance IQ score of 70 and a full scale IQ score of 68.  These
scores were deemed valid and placed Claimant in the mild mentally
deficient range of intellectual abilities.  (Tr. at 465-66.)
Bender scores indicated the possibility of an organic dysfunction.
Ms. Bell diagnosed a cognitive disorder, not otherwise specified
and a depressive disorder, not otherwise specified on Axis I and

made no Axis II diagnosis.  (Tr. at 467.)  Ms. Bell opined that Claimant

> has functioned at a higher level in the past and his current scores are a reflection of his head injury or a cognitive disorder.  The Bender Gestalt results are suggestive of an organic dysfunction.  Achievement scores indicate that he is functioning at the fifth grade level in reading skills, the second grade level in spelling skills, and the seventh grade level in arithmetic skills.  Mr. Burgess appears to be suffering from significant emotional problems and should remain in psychiatric treatment.  It is recommended that a neuropsychological evaluation be performed to rule out any organic etiology.

(Tr. at 467.)

At the administrative hearing, the vocational expert testified that if the Claimant were functioning in the mildly mentally deficient range of intellectual abilities, it would impact the person's ability to learn and would require repeated and substantial supervision such that it would be impractical for an individual to perform the jobs identified.  (Tr. at 582-83.)

Ahmed D. Faheem, M.D. examined Claimant on June 4, 2001.  Dr. Faheem noted that Claimant had some difficulty in organizing his thinking.  Dr. Faheem observed that "[f]und of knowledge was less than his educational level and background."  (Tr. at 470.)  Dr. Faheem diagnosed depressive disorder, not otherwise specified, rule out organic brain syndrome, dementia on Axis I and made no Axis II diagnosis.  He rated Claimant's GAF at 60.  (Tr. at 470.)  Dr. Faheem opined that for purposes of Claimant's worker's compensation claim, Claimant was entitled to a five percent permanent partial

disability for depression.  (Tr. at 470.)  Dr. Faheem noted that "[t]here does seem to be some indication that there might be some cerebral concussion and an organic brain impairment; however, we were not able to determine the extent of this problem in the testing at our office.  The Bender Gestalt indicated some organic brain impairment.  Therefore, I am recommending that he have a detailed neuropsychological testing done to determine if there is any organic brain impairment; and if so, that can be taken in consideration in determining any additional percentage of disability based upon those findings.  I feel that psychiatric problems within themselves are not disabling."  (Tr. at 471.)

John J. Kroening, M.D. examined Claimant on December 11, 2001, in connection with his workers' compensation claim and at the request of Claimant's employer.  Dr. Kroening noted that he had reviewed several medical reports that indicate Claimant had no problem with mental status testing, but reported difficulty with his memory.  He noted that all examiners attributed the memory deficit to depression.  Dr. Kroening opined that Claimant has no impairment as a result of post-concussion syndrome and that his memory loss is secondary to depression, not his 1995, injury. However, Dr. Kroening went on to observe that "I am seeing a totally different individual than I saw last March.  Today, he exhibits classic symptoms of Alzheimer's Disease.  I have seen quickly-accelerating organic brain syndrome in the past, and he

strikes me as someone with that rare problem.  I would hope that a repeat CT scan of the head would be performed to rule out my suspicion.  If this is not Alzheimer's, it could be an eccentric effect of psychotropic medications which he is taking."  (Tr. at 476.)

Claimant stopped working around January of 2002.  (Tr. at 16, 325.)

Lumbar spine x-rays on January 30, 2002, showed mild degenerative changes.  (Tr. at 282.)  An MRI on February 1, 2002, showed a diffusely bulging annulus at L3-L4 without evidence of disc herniation or spinal stenosis.  (Tr. at 281.)

On March 18, 2002, H.S. Ramesh, M.D. examined Claimant related to his complaints of middle and lower back pain traveling to his toes, neck pain and headaches.  Dr. Ramesh diagnosed lumbosacral strain/sprain, cervical strain/sprain, mild traumatic brain injury, degenerative joint disease, bilateral sacroiliac dysfunction and depression.  (Tr. at 290.)

The record includes treatment notes from Wayne Thacker, M.D. dated February 26, 1996, through April 4, 2002.  The treatment notes mention depression.  (Tr. at 303-21.)

On May 3, 2002, Lester Sargent, M.A. conducted a consultative mental examination.  In reviewing the medical records, Mr. Sargent noted that since Claimant's injury in 1995, he has mentioned problems with short-term memory and concentration.  Mr. Sargent

12

noted that a CT scan of the brain and a cervical spine MRI were both normal.  (Tr. at 325-26.)   On examination, Claimant was oriented to time, place, person and circumstance.   Short-term memory and attention and concentration were moderately impaired as Claimant had difficulty performing simple tasks that were asked of him.  (Tr. at 327.)  Mr. Sargent diagnosed pain disorder associated with both psychological factors and general medical condition and major depressive disorder, recurrent, moderate on Axis I.  He made no Axis II diagnosis.  (Tr. at 328.)

A State agency medical source completed a Physical Residual Functional Capacity Assessment, though most of this document is missing from the transcript.  (Tr. at 338.)

A State agency medical source also completed a Mental Residual Functional Capacity Assessment on July 3, 2002.  Most of that report also is missing from the transcript, with the exception of the Functional Capacity Assessment portion, in which the source states that "[t]he evidence supports moderate limitations" in concentration, but that Claimant "does, however, maintain the ability to learn and perform a variety of work-like activities." (Tr. at 349.)[1]

---

[1]  The absence of the complete Physical Residual Functional Capacity Assessment and the Mental Residual Functional Capacity Assessment did not prevent the court from determining whether the Commissioner's decision is supported by substantial evidence.  Claimant's challenges to the ALJ's physical findings do not involve the Physical Residual Functional Capacity Assessment.  Although Claimant does challenge the ALJ's decision related to Claimant's mental impairments, the substantive part of the Mental Residual Functional Capacity Assessment is contained in the record, and the complete

On July 3, 2002, a State agency medical source completed a Psychiatric Review Technique form and concluded that Claimant's depression and pain disorder resulted in mild restriction in activities of daily living, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence and pace and no repeated episodes of decompensation. (Tr. at 360.) These findings were affirmed by a second State agency medical source on February 3, 2003. (Tr. at 350.)

Dr. Thornton completed a Medical Assessment of (Mental) Ability to do Work-Related Activities on August 28, 2002. He opined that Claimant had poor abilities in almost every area of functioning. (Tr. at 486-89.) At the administrative hearing, the ALJ stipulated that with these limitations, there would be no work available for the Claimant. (Tr. at 581.)

Claimant underwent a functional capacity evaluation on March 11, 2003, which placed him in the sedentary range. The testing was deemed valid. Don Pinckney, OTR/L noted memory and concentration concerns. (Tr. at 500-01.)

X-rays of Claimant's lumbosacral spine on August 25, 2003, showed degenerative changes. (Tr. at 506.)

The record includes additional treatment notes from Dr. Thornton dated May 6, 2002, July 31, 2002, August 28, 2002,

_____

Psychiatric Review Technique also is contained in the record.

14

September 16, 2002, October 16, 2002, January 15, 2003, February 12, 2003, March 12, 2003, June 11, 2003, June 23, 2003, July 28, 2003, October 27, 2003, and November 17, 2003.  Claimant's GAF ranged from 30 to 50.  (Tr. at 528-53.)

On October 22, 2003, John D. Cook, D.O. completed a West Virginia Department of Health and Human Resources, General Physical (Adults). He noted Claimant's diagnoses, including chronic pain syndrome, degenerative disc disease, depression and decreased short term memory.  He felt that Claimant could not engage in any kind of work because of "multiple areas of pain," coupled with Claimant's age and education background.  (Tr. at 557.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to afford proper weight to the opinions of Claimant's treating psychiatrist, Dr. Thornton, and instead, improperly relied on the opinions of a nonexamining medical source; (2) the ALJ failed to properly credit Claimant's valid IQ scores; (3) the ALJ did not properly credit a valid functional capacity examination and the opinion of a neurosurgeon, Dr. Day, that if credited, would support a finding that Claimant is disabled under Rules 201.09 and 201.10 of the Medical-Vocational Guidelines.  (Pl.'s Br. at 11-15.)

The Commissioner argues that (1) substantial evidence supports the Commissioner's decision that Claimant is not disabled; and (2)

the ALJ properly weighed the medical evidence of record.  (Def.'s Br. at 11-17.)

In his decision, the ALJ concludes that Claimant suffers from medically determinable and severe depression, but concluded that Claimant did not suffer from a medically determinable organic mental disorder.  (Tr. at 19-20.)  The ALJ concluded that Claimant's "memory loss and difficulty concentrating and thinking are adequately explained by his depressive disorder, which is established as a medically determinable mental impairment."  (Tr. at 21.)  The ALJ further concluded that

> the totality of the record does not support a significant decline in intellectual functioning.  The undersigned rejects Ms. Bell's validation of the claimant's IQs on the grounds that they are "commensurate with someone who suffered a head injury" in the absence of medical evidence residuals of the head injury.  As for the claimant's motivation, the undersigned refers to recurrent evidence throughout the record to the effect that the claimant perceives himself as disabled and presents himself as less capable than he is (for example, Exhibit 17F, p. 3).

(Tr. at 22.)

In evaluating Claimant's subjective complaints related to his mental impairments, the ALJ acknowledged in his decision, Claimant's complaints of "insomnia, anhedonia, difficulty making decisions, occasional disorientation (does not know what he is doing), memory loss, apprehension, preoccupation with death, and suicidal ideation daily.  He reports that outpatient psychiatric treatment for depression has only temporarily alleviated his

symptoms from time to time." (Tr. at 25.)

In weighing the medical evidence of record related to Claimant's mental condition, the ALJ noted that Dr. Thornton treated Claimant from February of 1999, through January of 2000, but that, contrary to Claimant's assertions of ongoing treatment, he did not see Claimant again until May 2002. The ALJ thus concluded that "[t]he following one-time psychological and psychiatric evaluations [by Ms. Bell, Dr. Faheem and Mr. Sargent] are the best evidence of the claimant's psychological functioning as of the alleged onset of disability." (Tr. at 26.)

The ALJ seemed to rely heavily on Dr. Faheem's GAF rating of 60. (Tr. at 26.) In comparison, the ALJ questioned Dr. Thornton's GAF rating of 30 and later 50, and stated that he could not accept Dr. Thornton's GAF scores. "The scores appear to be based primarily on the claimant's subjective reports of the severity of his symptoms, contained in the 'Interval History' notes of each visit, and they do not seem to respond to improvement or setback as noted in the psychiatrist's progress note (e.g., compare Exhibit 41F, pp. 15-16 and 21-22). Except on those occasions when the claimant was referred to the hospital, the claimant's mental status examinations usually included the report that he was 'improved with medication.'" (Tr. at 27.)

The ALJ further explained that he rejected Dr. Thornton's opinions on the Medical Assessment of (Mental) Ability to do Work-

17

Related Activities because it was "not well supported by the treatment record and not consistent with the record as a whole (Exhibit 35F)." (Tr. at 27.) The ALJ explained that Dr. Thornton included "poor" ratings in the ability to relate to coworkers, deal with the public, behave in an emotionally stable manner or relate predictably in social situations, but that he stated in his progress notes that Claimant interacted well. The ALJ noted that Dr. Thornton rated Claimant's ability to understand, remember and carry out even simple instructions as poor, but that Dr. Thornton routinely assessed Claimant's cognitive functioning as "baseline" and noted "poor concentration" only once. (Tr. at 27.)

The ALJ concluded that Claimant was mildly limited in his activities of daily living, moderately limited in maintaining social functioning, moderately limited in concentration, persistence and pace and that he had no episodes of decompensation. (Tr. at 28.)

The ALJ determined that Claimant's depression and resulting limitations reduced his residual functional capacity from a mental standpoint by restricting him to "routine, repetitive tasks." (Tr. at 30.) The ALJ explained in his decision that

> [i]n arriving at the claimant's residual functional capacity, the undersigned substantially adopts the concurring mental residual functional capacity assessments of the state agency consultants at the initial level and upon reconsideration (Exhibit 19F). Although the claimant is moderately limited in social functioning, the claimant does not exhibit any specific functional limitations that would significantly limit his

18

> ability to respond appropriately to supervision,
> coworkers, or usual work situations. The claimant's
> tendency not to participate in social activity does not,
> by the claimant's own report, indicate that he cannot
> interact appropriately with the general public. On the
> other hand, the record as a whole supports a significant
> limitation on the claimant's ability to maintain
> attention and concentration for extended periods of time
> and to maintain average persistence and pace without
> being interrupted by psychological symptoms, which
> warrants claimant being restricted to routine repetitive
> tasks.

(Tr. at 30.)

The court finds that the ALJ's decision is not supported by substantial evidence. Claimant's case is certainly complicated by the lack of adequate development related to a possible organic mental disorder. It is unfortunate that Claimant has not had a followup CT scan or been examined by a traumatic brain injury or other specialist, as has been repeatedly recommended in the record. With the evidence as it stands before the ALJ, the court cannot disagree with the ALJ's determination that Claimant does not have a medically determinable organic mental disorder. <u>See</u> 20 C.F.R. § 404.1520a(b)(1) (2004) (symptoms, signs, and laboratory findings must be evaluated to determine whether a claimant has a medically determinable mental impairment).

Nevertheless, substantial evidence of record very clearly establishes significant problems in memory and concentration that are not reflected in the ALJ's residual functional capacity finding and hypothetical question restricting Claimant to "routine, repetitive tasks." (Tr. at 30, 580); <u>Walker v. Bowen</u>, 889 F.2d 47,

19

51 (4th Cir. 1989) (a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments). Treating and examining sources of record, including Dr. Thornton, Dr. Faheem, Dr. Kroening, Dr. John, Ms. Bell and Mr. Sargent, all found significant limitations in memory and concentration. Other physicians throughout the record mention or allude to such limitations in their treatment notes, including Dr. Bailey, Dr. Derakhshan, Mr. Pinckney and Dr. Cook. (Tr. at 388-96, 403, 500-01, 557.) To Dr. Kroening, Claimant exhibited classic "Alzheimer's Disease" symptoms and had deteriorated since his last examination. (Tr. at 476.) Ms. Bell found IQ scores that placed Claimant in the mildly mentally retarded range of intellectual functioning. The ALJ rejected those scores on the grounds that Ms. Bell found them "'commensurate with someone who suffered a head injury' in the absence of medical evidence residuals of the head injury." (Tr. at 22.) While the ALJ attempted to discredit Ms. Bell's IQ scores, they were valid and, as she indicated in her report, Claimant also was reading on a fifth grade level, spelling on a second grade level and doing arithmetic on a seventh grade level. (Tr. at 466.) Moreover, Dr. Faheem observed that Claimant's "fund of knowledge was less than his educational level and background." (Tr. at 470.) The ALJ does not make an effort to determine what these valid IQ scores mean in

relation to Claimant's mental impairments.  At the very least, this reliable evidence would suggest that Claimant is more limited from a mental standpoint than the ALJ's residual functional capacity finding suggests.

Furthermore, the ALJ determined that Claimant has moderate limitations in social functioning, yet failed to include any limitations in this regard in the residual functional capacity finding and the hypothetical question.  At the end of his decision, the ALJ explained that Claimant "does not exhibit any specific functional limitations that would significantly limit his ability to respond appropriately to supervision, coworkers, or usual work situations.  The claimant's tendency not to participate in social activity does not, by claimant's own report, indicate that he cannot interact appropriately with the general public."  (Tr. at 30.)  Notably, Dr. Thornton opined that Claimant had no ability to deal with the general public.  (Tr. at 487.) In any event, either Claimant has a moderate limitation in social functioning, the limitations from which should be reflected in the ALJ's residual functional capacity finding and the hypothetical question, or he does not.  The ALJ's decision is inconsistent on this score.

Based on the above, the court concludes that the ALJ's decision is not supported by substantial evidence and must be reversed and remanded for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

21

It appears to the court that a complicated case such as Claimant's is one where the testimony of a medical expert would be helpful, though the court recognizes the ultimate decision on whether to call a medical expert is within the Commissioner's discretion.  20 C.F.R. § 404.1527(f)(2)(iii) (2004).

Finally, efforts should be made on remand to obtain any records related to hospitalizations referred to by Dr. Thornton, as they are not included in the record.

The court does not address Claimant's remaining argument related to the weight afforded Dr. Day's opinion and the functional capacity evaluation.  These issues can be addressed on remand.

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is not supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Summary Judgment is DENIED, Defendant's Motion for Judgment on the Pleadings is DENIED, this matter is REVERSED and REMANDED for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g) and this matter is DISMISSED from the docket of this court.

The Clerk of this court is directed to provide copies of this Order to all counsel of record.

ENTER: September 28, 2005

*Mary E. Stanley*

Mary E. Stanley
United States Magistrate Judge